UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| VLADIMIR GUSINSKY REVOCABLE TRUST, derivatively on behalf of Microsoft Corporation,<br><br>        Plaintiff,<br><br>        vs.<br><br>SATYA NADELLA, AMY E. HOOD, JARED SPATARO, RAJESH JHA, REID HOFFMAN, HUGH JOHNSTON, TERI LIST, CATHERINE MACGREGOR, MARK MASON, SANDRA E. PETERSON, PENNY PRITZGER, CHARLES W. SCHARF, JOHN W. STANTON, and EMMA WALMSLEY,<br><br>        Defendants,<br><br>        - and -<br><br>MICROSOFT CORPORATION,<br><br>        Nominal Defendant. | Case No.<br><br>SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934<br><br><br>DEMAND FOR JURY TRIAL |

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................................3

II.  JURISDICTION AND VENUE ..........................................................................7

III.  PARTIES ............................................................................................................7

IV.  FACTUAL ALLEGATIONS .............................................................................10

V.  THE INDIVIDUAL DEFENDANTS CAUSED MICROSOFT TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE RELEVANT TIME PERIOD ............................19

VI.  ALLEGATIONS DEMONSTRATING DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF THE TRUE FACTS ..........................................39

VII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ........................41

   A.  Each Demand Director Faces a Substantial Likelihood of Personal Liability for Directly Participating in the Supervision of the $13 Billion Partnership With OpenAI, Pursuant to Which the Director Defendants Caused Microsoft to Jointly Develop the Infringing AI Systems ...................................42

   B.  Each Demand Director Faces a Substantial Likelihood of Liability for Approving the Issuance of False and Misleading Public Statements ...................45

   C.  Defendant Nadella is Interested and Received Improper Financial Benefits ........46

   D.  Demand is Futile as to the Audit Committee Directors ..........................................47

   E.  Demand is Futile as to Directors Pritzger, Hoffman, Stanton, Walmsley, and MacGregor ........................................................................................47

   F.  Demand is Futile for Additional Reasons ..............................................................48

VIII.  CAUSES OF ACTION .......................................................................................49

FIRST CAUSE OF ACTION
Breach of Fiduciary Duty
(Against All Individual Defendants)...............................................................................49

SECOND CAUSE OF ACTION
Violation of Section 14(a) of the Securities Exchange Act
(Against All Director Defendants)..................................................................................50

1

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

THIRD CAUSE OF ACTION
Unjust Enrichment
(Against the Executive Officer Defendants)....................................................................51

IX.    PRAYER FOR RELIEF ........................................................................................52

X.    JURY DEMAND ...................................................................................................53

2

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

Plaintiff Vladimir Gusinsky Revocable Trust ("Plaintiff"), derivatively on behalf of Microsoft Corporation ("Microsoft" or the "Company") alleges the following based on personal knowledge as to Plaintiff and Plaintiff's acts and as to all other matters on information and belief based on the investigation of Plaintiff's counsel, which included, among other things, a review of legal and regulatory filings, press releases, a review of U.S. Securities and Exchange Commission ("SEC") filings of Microsoft Corporation, Microsoft's online documents, media reports about Microsoft and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   Plaintiff brings this shareholder derivative action on behalf of Microsoft to remedy wrongdoing committed by certain of the Company's officers and directors. Throughout the relevant time period (January 1, 2022, to the present), Defendants caused Microsoft to make false and misleading statements about its artificial intelligence ("AI") strategy, the Company's Copilot family of products, and financial results. During the same time, Microsoft's officers and directors caused the Company to violate copyright and intellectual property laws by training its AI software on copyrighted works and commercialize voiceprints for which it did not possess lawful licenses.

2.   Microsoft told its shareholders and the market that it did not violate federal copyright laws with respect to development and training of its AI software, AI generative models, and products, stating: "Generative AI Models — Microsoft uses a variety of data sources, including publicly available information, *in a manner consistent with global copyright laws*." It similarly stated that "*we do not train on data from domains listed in the Office of the United States Trade Representative Notorious Markets for Counterfeiting and Piracy list*" and "*We train on data that we gain access to* (*such as archives and metadata*) *through negotiated arrangements with publishers and copyright owners*."

3.   Beginning in September 2023, however, Microsoft was sued for copyright infringement by numerous authors and copyright holders. The first of such cases was *Authors Guild*

3

SHAREHOLDER DERIVATIVE COMPLAINT

*v. OpenAI & Microsoft Corp.*, No. 1:23-cv-08292 (S.D.N.Y.).  This was the first major class action against Microsoft by book authors. It was originally filed in September 2023 against OpenAI, and an amended complaint filed in December 2023 added Microsoft as a defendant.  Notable plaintiffs include John Grisham, George R. R. Martin, Jodi Picoult, Jonathan Franzen, David Baldacci, the Authors Guild, and numerous other bestselling novelists.  The complaint alleges that: (1) Microsoft and OpenAI copied hundreds of thousands of copyrighted books without permission to train GPT models; (2) Microsoft knowingly participated by investing billions of dollars in OpenAI, providing Azure supercomputing infrastructure, integrating GPT into Bing Chat and Copilot, and sharing in the commercial exploitation of the models; and (3) The models can generate summaries and passages derived from copyrighted books, diminishing the market for licensed works.  The complaint seeks certification of a nationwide class and asserts claims for copyright infringement and other causes of action.

4.      In January 2024, *Basbanes v. Microsoft Corp. & OpenAI* was filed — No. 1:24-cv-00084 (S.D.N.Y.).  Unlike the *Authors Guild* case, this complaint focuses more heavily on investigative nonfiction books.  The plaintiffs allege that Microsoft: (1) copied plaintiffs' books during AI training; (2) the copying occurred without licenses; (3) Microsoft was an active participant rather than merely an investor; and (4) Microsoft's products commercially exploit the allegedly infringing models.  The complaint seeks statutory damages, actual damages, disgorgement of profits, and injunctive relief preventing further use of copyrighted books.

5.      On June 24, 2025, another major lawsuit was filed in New York against Microsoft by numerous authors alleging that Microsoft: (1) copied nearly 200,000 pirated books (primarily from the Books3 dataset); (2) used those books to train its Megatron AI models; (3) infringed their copyrights by reproducing and using the works without permission; and (4) seeking statutory damages and an injunction.  The plaintiffs include well-known authors such as Kai Bird, Jia Tolentino, Daniel Okrent, and several others.

6.      Then, in June 2026, a coalition of nearly 400 U.S. print and digital newspaper publishers filed a federal civil complaint in the Southern District of New York against Microsoft

4

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

for allegedly scraping their copyrighted content without permission or compensation to train large language models like Microsoft Copilot — *Richner Communications, Inc. v. Microsoft Corp.*, No. 26-cv-5320 (S.D.N.Y.).

7.    The publishers claim that Microsoft: (1) Systematically and secretly crawled publisher websites, including content behind paywalls; (2) Copied articles, stories, and other original works onto their own servers; (3) Stripped copyright management information (author credits, publication names, copyright notices) before using the content; and (4) Used the material to train AI models, which allegedly reproduced it verbatim or near-verbatim in responses to user prompts.

8.    These complaints allege that Microsoft was far from a passive investor, having (a) invested more than $10 billion in OpenAI; (b) supplied the Azure infrastructure used for model training; (c) helped develop and deploy GPT-based systems, markets and profits from products such as Microsoft Copilot; and (d) knew copyrighted books were being used for training. Accordingly, the complaints generally assert not only secondary liability, but also direct liability based on Microsoft's direct participation in the development and commercialization of the AI systems.

9.    Microsoft also engaged in the training and deployment of generative AI models, voice synthesis, voice cloning, and voice-conversion models, that developed multiple commercial voice models ("CVMs") for Microsoft's commercial voice AI products.  Microsoft distributes these CVMs through Microsoft's synthesis models that empower Microsoft CVMs, Azure AI Speech, Microsoft Foundry, Microsoft Copilot, and Dynamics 365 Contact Center voice offerings.  Microsoft ingested within each of these CVMs hundreds of thousands of hours of human speech recordings and extracted the unique biometric signatures and the voiceprints of the speaker from those recordings.  In violation of the Illinois Biometric Information Privacy Act ("BIPA"), the Defendants failed to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording into the training pipeline, which resulted in damages to the source speakers.

5

SHAREHOLDER DERIVATIVE COMPLAINT

10.     Beginning on February 5, 2026, Microsoft was sued for BIPA violations.  The initial case was filed in this Court, *Basich v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash.).  The action alleged that Microsoft violated BIPA by collecting biometrics, such as voiceprints, on Microsoft Teams meetings, which were then stored on Microsoft Azure servers.  Microsoft failed to obtain the Microsoft Team meeting participants' informed, written consent prior to collecting and using those voiceprints to build transcriptions—in violation of BIPA.

11.     On May 12, 2026, Microsoft was sued in the Northern District of Illinois for more extensive BIPA violations, in the action *Flowers v. Microsoft Corp.*, No. 1:26-cv-05491 (N.D. Ill.).  In the *Flowers* action, broadcast journalists, investigative podcastors, audiobook narrators, and voice actors alleged that Microsoft violated BIPA by utilizing its CVM AI platforms to extract the plaintiffs' voiceprints without notice or consent, which deprived their "BIPA guarantees to make an informed decision about the collection and use of their biometric data."

12.     During the same time, Microsoft's officers and directors caused the Company to issue false and misleading statements touting the success of the Company's AI strategy, including its Copilot family of products and CVMs, while concealing material problems, including the fact that Microsoft had violated federal copyright laws in the formulation of its AI strategy and its partnership with AI companies like OpenAI; that the Company's Copilot software had experienced major undisclosed problems with brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability; that Microsoft's proprietary AI model was performing well below competitors on several industry tests; and that Microsoft violated BIPA by ingesting hundreds of thousands of hours of human speech and extracting the unique biometric signatures and voiceprints of the speakers on those recordings.

13.     This misconduct has caused substantial damage to Microsoft and its shareholders.  Moreover, the wrongdoing was directly committed or approved by the most senior executive officers and directors of Microsoft.  The Board of Directors receives regular reports and approves the key decisions regarding Microsoft's AI strategy.

6

SHAREHOLDER DERIVATIVE COMPLAINT

14. This shareholder derivative action seeks to hold the Company's officers and directors responsible for breaching their fiduciary duties, causing the Company to engage in widespread violation of copyright laws, and approving false and misleading statements, all of which have caused substantial damages to the Company.

## II. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because certain of the events or omissions giving rise to the claim occurred in this District, including the dissemination of the statements alleged to be materially false and misleading into this District. Microsoft's corporate headquarters are also located in this District.

17. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

18. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

19. Plaintiff Vladimir Gusinsky Revocable Trust is a current shareholder of Microsoft Corporation and has continuously owned shares of Microsoft Corporation at all relevant times.

7

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

20.     Defendant Microsoft is a multinational technology conglomerate headquartered in Redmond, Washington.  Microsoft common stock trades on the Nasdaq under the ticker symbol "MSFT."

21.     Defendant Satya Nadella ("Nadella") served as Microsoft's Chief Executive Officer ("CEO") and Chairman of its Board of Directors during the relevant time period.

22.     Defendant Amy E. Hood ("Hood") served as Microsoft's Chief Financial Officer ("CFO") and Executive Vice President during the relevant time period.

23.     Defendant Jared Spataro ("Spataro") served as Microsoft's Chief Marketing Officer, AI at Work ("AI CMO") during the relevant time period.

24.     Defendant Rajesh Jha ("Jha") served as Microsoft's Executive Vice President, Experiences and Devices ("EVP E&D") during the relevant time period. In March 2026, Microsoft announced that defendant Jha would be retiring after more than 35 years of working with the Company.

25.     Defendants Nadella, Hood, Spataro, and Jha are sometimes collectively referred to herein as the "Executive Officer Defendants."

26.     Defendant Reid Hoffman ("Hoffman") has served as a Microsoft director at all relevant times.

27.     Defendant Hugh Johnston ("Johnston") has served as a Microsoft director at all relevant times.

28.     Defendant Teri List ("List") has served as a Microsoft director at all relevant times.

29.     Defendant Catherine MacGregor ("MacGregor") has served as a Microsoft director at all relevant times.

30.     Defendant Mark Mason ("Mason") has served as a Microsoft director at all relevant times.

31.     Defendant Sandra E. Peterson ("Peterson") has served as a Microsoft director at all relevant times.

32.     Defendant Penny Pritzker ("Pritzker") has served as a Microsoft director at all

8

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

relevant times.

33. Defendant Charles W. Scharf ("Scharf") has served as a Microsoft director at all relevant times.

34. Defendant John W. Stanton ("Stanton") has served as a Microsoft director at all relevant times.

35. Defendant Emma Walmsley ("Walmsley") has served as a Microsoft director at all relevant times.

36. Defendants Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Scharf, Stanton, and Walmsley are sometimes referred to herein as the "Director Defendants."

37. The Executive Officer Defendants and the Director Defendants are sometimes referred to herein as the Individual Defendants. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, partners, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

38. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the Nasdaq, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, partners, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Microsoft common stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

the relevant time period violated these specific requirements and obligations.

39. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the relevant time period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    FACTUAL ALLEGATIONS

40. Microsoft is one of the few companies in the world with a market capitalization exceeding 1 trillion dollars. It sells the ubiquitous Windows operating system software that most of the world's computers run on. It was started by Bill Gates and Paul Allen on April 4, 1975.

41. To continue its growth, Microsoft has embraced artificial intelligence ("AI"). By embedding AI across its cloud infrastructure and productivity tools, Microsoft has sought to secure long-term platform lock-in. Microsoft's Intelligent Cloud division (housing Azure) is the Company's largest and fastest-growing segment. Azure AI services are a primary growth engine, driving significant double-digit revenue jumps as the company builds out its massive global data center footprint. During fiscal year 2025, Azure revenues increased 34% to more than $75 billion, driving a 14% increase in gross margin for the Intelligent Cloud segment. Throughout the relevant time period, defendants represented that Microsoft's revenue growth would continue to be driven by Azure.

42. Azure's recent growth has been achieved in large part by Microsoft's integration of AI capabilities throughout the platform's products and services. Instead of just providing raw models, Microsoft has embedded Microsoft 365 Copilot deeply into its suite of enterprise tools (Teams, Office, GitHub), reaching over 100 million monthly active users. Microsoft has positioned

10

SHAREHOLDER DERIVATIVE COMPLAINT

itself as a leader in generative AI and has repeatedly emphasized the importance of AI to the Company's strategy, competitive position, and future growth. To advance that strategy, Microsoft has invested billions of dollars in companies developing large language models ("LLMs")—AI systems trained on massive datasets to perform natural language tasks, including generating human-like text and other content.

43.     To further its aggressive push into AI-enabled software, Microsoft has invested over $13 billion since 2019 in OpenAI, the developer of ChatGPT, which is a large language model (LLM).  Microsoft has also recently committed to investing billions more in Anthropic, the developer of rival LLM Claude. These deals have been criticized for their apparent circularity, as the LLM providers and Microsoft have committed to using each other's products and services, and for creating potential concentration risk given their size.

44.     After investing billions in OpenAI, Microsoft began actively collaborating with OpenAI in the development of AI systems.  Those collaborations involved training AI systems on copyrighted materials for which OpenAI and Microsoft did not have the necessary legal rights or licenses.

45.     In 2023, Microsoft also introduced its own proprietary generative AI chatbot, Copilot. Originally built on ChatGPT, more recently Microsoft has integrated technology from Claude to power Copilot and begun working on its own internal LLMs. Microsoft has launched numerous versions of Copilot across many of its consumer and enterprise applications, each with different features and use cases. Microsoft offers Copilot as a "freemium" model, allowing users to use basic features free of charge but then charging consumers and businesses for more premium features and capabilities, which the Company calls paid "seats."

46.     Beginning in September 2023, Microsoft's unlawful misappropriation of copyrighted materials resulted in it being sued for copyright infringement by numerous authors and copyright holders.  The first such case was *Authors Guild v. OpenAI & Microsoft Corp.*, No. 1:23-cv-08292 (S.D.N.Y.).  This was the first major class action against Microsoft by book authors. It was originally filed in September 2023 against OpenAI, and an amended complaint filed in

11

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

December 2023 added Microsoft as a defendant. Notable plaintiffs include John Grisham, George R. R. Martin, Jodi Picoult, Jonathan Franzen, David Baldacci, the Authors Guild, and numerous other bestselling novelists. The complaint alleges that: (1) Microsoft and OpenAI copied hundreds of thousands of copyrighted books without permission to train GPT models; (2) Microsoft knowingly participated by investing billions of dollars in OpenAI, providing Azure supercomputing infrastructure, integrating GPT into Bing Chat and Copilot, and sharing in the commercial exploitation of the models; and (3) The models can generate summaries and passages derived from copyrighted books, diminishing the market for licensed works. The complaint seeks certification of a nationwide class and asserts claims for copyright infringement and other causes of action.

47. In January 2024, *Basbanes v. Microsoft Corp. & OpenAI,* No. 1:24-cv-00084, was filed in the United States District Court for the Southern District of New York. Unlike the *Authors Guild* case, this lawsuit focuses more heavily on investigative nonfiction books. The plaintiffs allege that Microsoft: (1) copied plaintiffs' books during AI training; (2) the copying occurred without licenses; (3) Microsoft was an active participant rather than merely an investor; and (4) Microsoft's products commercially exploit the allegedly infringing models. The complaint seeks statutory damages, actual damages, disgorgement of profits, and injunctive relief preventing further use of copyrighted books.

48. On June 24, 2025, another major lawsuit was filed in New York against Microsoft by numerous authors alleging that Microsoft: (1) copied nearly 200,000 pirated books (primarily from the Books3 dataset); (2) used those books to train its Megatron AI models; (3) infringed their copyrights by reproducing and using the works without permission; and (4) seeking statutory damages and an injunction. The plaintiffs include well-known authors such as Kai Bird, Jia Tolentino, Daniel Okrent, and several others.

49. Then, in June 2026, a coalition of nearly 400 U.S. print and digital newspaper publishers filed a federal civil complaint in the Southern District of New York against Microsoft for allegedly scraping their copyrighted content without permission or compensation to train large language models like Microsoft Copilot – *Richner Communications, Inc. v. Microsoft Corp.*, No.

12

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

26-cv-5320 (S.D.N.Y.).

50.    The publishers claim that Microsoft: (1) Systematically and secretly crawled publisher websites, including content behind paywalls; (2) Copied articles, stories, and other original works onto their own servers; (3) Stripped copyright management information (author credits, publication names, copyright notices) before using the content; and (4) Used the material to train AI models, which allegedly reproduced it verbatim or near-verbatim in responses to user prompts.

51.    A common feature across these complaints is that plaintiffs attempt to distinguish Microsoft from a passive investor. They allege that Microsoft invested more than $10 billion in OpenAI, supplied the Azure infrastructure used for model training, helped develop and deploy GPT-based systems, markets and profits from products such as Microsoft Copilot, and knew copyrighted books were being used for training.  Accordingly, the complaints generally assert not only secondary liability, but also direct liability based on Microsoft's own participation in the development and commercialization of the AI systems.

52.    As a result of these lawsuits, the Individual Defendants were well aware of Microsoft's alleged large-scale violation of copyrighted materials.

53.    Microsoft also engaged in building commercial voice AI products using the voices of real people.  Microsoft set these up on their "CVMs," which included Azure AI Speech, Microsoft Foundry, Microsoft Pilot, and Dynamics 365 Contact Center, where Microsoft ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures and voice of speakers' recordings. Microsoft 365 includes Microsoft Teams, which implements speaker diarization and voice attribution features through its meeting transcription pipeline.  Microsoft monetizes the voice models through a vertically integrated commercial chain spanning Azure cloud subscriptions and consumption-based pricing, Microsoft Foundry deployments, Microsoft Copilot integrations across Microsoft 365 and Windows, Microsoft Teams premium licensing tiers and meeting-transcription features, Dynamics 365 Contact Center deployments, real-time voice agent licensing through the Voice Live API, Limited Access deployments of Custom Neural Voice and

13

SHAREHOLDER DERIVATIVE COMPLAINT

Personal Voice, and the conversational and speech-recognition assets of Microsoft's acquired Nuance Communications subsidiary. The voice characteristics learned during training, the same characteristics extracted from voice recordings, enable each of these revenue streams.

54. Microsoft's commercial voice AI products include:

a. The prebuilt Azure neural voice catalog and Azure neural HD voices, which provide commercial text-to-speech in over 150 languages and locales through Azure AI Speech;

b. Custom Neural Voice, released in general availability in February 2021 and expanded into Dynamics 365 Contact Center in March 2026, a Limited Access feature that allows customers to train custom voice models from voice-talent recordings;

c. Personal Voice, a Limited Access feature within Azure AI Speech that synthesizes replications of an individual's voice from short audio prompts in over 90 languages;

d. The Voice Live API, announced in public preview at Microsoft Build in May 2025, provides low-latency speech-to-speech voice agent capabilities;

e. MAI-Voice-1, announced by Microsoft AI on August 28, 2025, and made generally available in the Microsoft Foundry Model Catalog by April 2026, an expressive single- and multi-speaker voice generation model deployed in Microsoft Copilot Daily, Copilot Podcasts, and Copilot Labs;

f. The Speaker Recognition API, which provides text-dependent and text-independent speaker verification and identification through Azure AI Speech;

g. Microsoft Teams voice attribution and transcription, which deploys speaker-diarization technology in Microsoft's Teams meeting pipeline;

h. The VALL-E, VALL-E X, VALL-E 2, NaturalSpeech, NaturalSpeech 2, NaturalSpeech 3, SpeechX, LiveSpeech, ELaTE, and DeepSinger research model families developed by Microsoft Research, certain of which (including

14

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

VALL-E 2 and ELaTE) Microsoft has elected to retain on a research-only basis; and

i. The Dragon family and associated conversational and speech recognition assets acquired through Microsoft's 2022 acquisition of Nuance Communications.

55. All of Microsoft's commercial voice AI products include base-model training. On this training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings.

56. Supposedly, Microsoft reports its voice AI revenue within the Microsoft Cloud and Productivity and Business Processes segments of its consolidated financials. In Microsoft's data, privacy, and security documentation for Azure AI Speech, it states that Microsoft "may process biometric voice signatures" from a recorded acknowledgement statement and from "random audio for the training dataset(s)" to confirm same-speaker identity using Azure AI Speaker verification. In Microsoft's Article 4 of the General Data Protection Regulation, Microsoft defines that "Biometric Data" expressly includes "personal data resulting from specific technical processing relating to physical, physiological or behavioral characteristics of a natural person, which allow or confirm the unique identification of that natural person, such as facial images or dactyloscopic data."[1]

57. Microsoft's focus is on providing safeguard measures is for the potential "downstream" misuse of Microsoft's commercial voice products. Microsoft allegedly requires that: "If you are using Microsoft products or services to process Biometric Data, you are responsible for: (i) providing notice to data subjects, including with respect to retention periods and destruction; (ii) obtaining consent from data subjects; and (iii) deleting the Biometric Data, all as appropriate and required under applicable Data Protection Requirements."

58. But this only constrains the downstream of Microsoft's commercial pipeline. None of this is directed at the "upstream" in Microsoft's commercial voice product platforms. Microsoft's

---

[1] Microsoft, *Disclosure for voice and avatar talent*, Microsoft Learn, https://learn.microsoft.com/eu-us/azure/ai-foundry/resposible-ai/speech-service/text-to-speech/disclosure-voice-talent.

15

SHAREHOLDER DERIVATIVE COMPLAINT

foundational voice synthesis models — including the prebuilt Azure neural voice catalog, Azure neural HD voices, MAI-Voice-1, and the VALL-E and NaturalSpeech research models — were trained on voiceprints extracted without the knowledge or consent of the speakers whose voice recordings were ingested during training. Microsoft built each of these safeguards to prevent downstream misuse of its products and to protect the customers and voice talent with whom it had a commercial relationship. It built none of them for the people whose voices it took to train those products in the first place.

59.    If Microsoft's prebuilt Azure neural voices, Azure neural HD voices, and MAI-Voice-1 were trained entirely on properly licensed or consented data, Microsoft would have an obvious commercial incentive to say so. It has not.  Microsoft obtained substantial portions of its training data, across multiple foundational model families, from publicly accessible sources without the consent of the source speakers, authors, or content creators, and Microsoft did so at industrial scale.  Microsoft's VALL-E paper publicly states that the model was "trained with LibriLight, a corpus consisting of 60K hours of English speech with over 7000 unique speakers," a corpus derived from LibriVox audiobook recordings without speaker-by-speaker consent. Microsoft's NaturalSpeech 2 paper reports training on approximately 44,000 hours of speech and singing data. Microsoft's NaturalSpeech 3 paper reports a 1-billion parameter model trained on approximately 200,000 hours of data. Microsoft's DeepSinger paper expressly identifies the training data as "data mined from the web" through a self-built pipeline that crawled music websites, separated vocals from instrumental accompaniment, aligned lyrics, and filtered audio samples.  Microsoft has willingly ingested identifiable voice recordings from those platforms without obtaining the consent of the speakers whose voices appear in the recordings.  Microsoft's voice-audio acquisition pipeline operates at a scale and on a category of source material, music recordings drawn from the public web, that aligns with the long-form, single speaker, professionally produced audio on which Microsoft's commercial voice synthesis models depend.

60.    Microsoft extracted voiceprints from Teams meeting speakers, broadcast journalists, investigative podcasters, audiobook narrators, and voice actors without notice or consent, depriving

16

SHAREHOLDER DERIVATIVE COMPLAINT

them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Microsoft retains those voiceprints in its commercial models and continues to profit from them. Microsoft has further disseminated those voiceprints, encoded in model parameters, across its global Azure infrastructure, through its acquired Nuance speech services business, and to third-party affiliates, vendors, subprocessors, and service providers that operate Microsoft's voice products at scale. The voiceprints cannot be recovered or replaced.

61.     Beginning on February 5, 2026, Microsoft was sued for BIPA violations.  The initial case was filed in this Court, *Basich v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash.).  The action alleged that Microsoft violated BIPA by collecting biometrics, such as voiceprints, on Microsoft Teams meetings, which were then stored on Microsoft Azure servers.  Microsoft failed to obtain the Microsoft Team meeting participants' informed, written consent prior to collecting and using those voiceprints to build transcriptions—in violation of BIPA.

62.     On May 12, 2026, Microsoft was sued in the Northern District of Illinois for more extensive BIPA violations, in the action *Flowers v. Microsoft Corp.*, No. 1:26-cv-05491 (N.D. Ill.). In the *Flowers* action, broadcast journalists, investigative podcastors, audiobook narrators, and voice actors alleged that Microsoft violated BIPA by utilizing its CVM AI platforms to extract the plaintiffs' voiceprints without notice or consent, which deprived their "BIPA guarantees to make an informed decision about the collection and use of their biometric data."

63.     The Company's Directors also failed to act on numerous red flags related to Microsoft's copyright and IP infringement.  For example, on June 23, 2025, Judge William Alsup issued a widely anticipated order in *Bartz v. Anthropic*, No. 3:24-cv-05417-WHA (N.D. Cal.) in which he held that there was a major difference between training AI systems based on legally acquired books and data and training such systems on pirated books and data.  Judge Alsup's decision was the first federal court decision squarely addressing whether using copyrighted works to train a generative AI model can qualify as fair use.  Judge Alsup reached two key conclusions:

(a)     Training on lawfully acquired books was "exceedingly transformative" and could constitute fair use under 17 U.S.C. § 107.

17

SHAREHOLDER DERIVATIVE COMPLAINT

(b)    Downloading and maintaining millions of pirated books in Anthropic's central library was not protected by fair use, and the infringement claims based on those copies would proceed to trial.

64.    Even after such order, however, Microsoft's directors failed to cause Microsoft to comply with the law and permitted the unlawful training to continue.

65.    The Director Defendants were not passive participants but instead had direct oversight responsibility for Microsoft's massive, multi-billion-dollar investments in OpenAI and Anthropic.  As noted *supra*, Microsoft has been a co-developer, co-designer, and commercial partner that participated in the creation, training, deployment, and monetization of the infringing AI systems.  Pursuant to those investments, Microsoft invested $13 billion in OpenAI, in exchange for which Microsoft is entitled to recover its investment through a large share of OpenAI Global's profits.  Further, after repayment, Microsoft will retain a substantial continuing equity interest in OpenAI.  As a result of these massive investments, which are highly material to Microsoft, the Director Defendants have had direct oversight of the investment.

66.    Under the Director Defendants' supervision and pursuant to their direct approval, Microsoft designed and built a bespoke Azure supercomputing environment specifically for OpenAI.  It then (1) engineered that infrastructure in collaboration with OpenAI; (2) optimized it for training large language models on internet-scale datasets; and (3) continues to operate that infrastructure during both training and inference.  Under the Director Defendants' direct oversight, Microsoft knowingly designed and operated the infrastructure used to ingest and process copyrighted material and commercialized voiceprints at scale.

67.    Microsoft's cloud infrastructure was specifically designed to use "essentially the whole internet" and was developed "in collaboration with and exclusively for OpenAI" to train its AI models.  As a result, the Director Defendants knew or recklessly disregarded the fact that pirated books, voiceprints, and data were being used to train the AI systems and software.

68.    Under the Individual Defendants' direction, Microsoft greatly expanded its collaboration with OpenAI.  On October 28, 2025, Microsoft and OpenAI announced the "next

18

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

phase" of their historic partnership. Among other changes, OpenAI restructured as a for-profit public benefit corporation, of which Microsoft retained a 27% stake on an as-converted diluted basis (which Microsoft valued at $135 billion), while OpenAI agreed to purchase $250 billion worth of incremental Azure services. In April 2026, the parties announced the agreement had been revised again to purportedly add greater clarity and flexibility, among other revisions.

69.    Similarly, on November 18, 2025, Microsoft and Anthropic (together with chip manufacturer NVIDIA Corporation) announced a strategic partnership whereby Microsoft will invest up to $5 billion in Anthropic and power its in-house AI products in services in part with Claude, while Anthropic committed to purchasing $30 billion of Azure compute capacity and up to one gigawatt of additional capacity from Microsoft.

70.    The Individual Defendants highlighted the purported success of Copilot and Microsoft's foray into AI development, claiming that Copilot offered best-in-class capabilities and enjoyed widespread and growing user adoption.  Defendants also downplayed concerns about the Company's AI investments and business dealings with LLM providers and other companies, claiming that Microsoft was well positioned to achieve suitable returns on its AI-related investments and emerge a key benefactor from AI technological advancements. As a result of these and similar statements, the price of Microsoft stock reached an intraday all-time high of over $551.05 per share on July 31, 2025.

## V.    THE INDIVIDUAL DEFENDANTS CAUSED MICROSOFT TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE RELEVANT TIME PERIOD

71.    On October 24, 2024, Microsoft filed its 2024 Proxy Statement, which was filed with the SEC and distributed to Microsoft shareholders in advance of the Company's 2025 Annual Meeting of shareholders, which was held December 10, 2024.  The Proxy Statement was reviewed and approved by each of the Individual Defendants.

72.    The 2024 Proxy stated:

**AI Strategy, Governance, and Regulation**

***The Board maintains direct oversight over AI strategy risk.*** Our Environmental, Social, and Public Policy Committee assists the Board in overseeing Microsoft's AI

19

SHAREHOLDER DERIVATIVE COMPLAINT

governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs. ***The Committee receives and provides feedback on regular updates from management regarding Microsoft's ability to design, build, and use AI in a way that meets regulatory expectations***.[2]

73.     The 2024 Proxy also stated:

**Responsible AI**

Microsoft continues to advance our Responsible AI principles into practice across the Company to develop and deploy AI that will have a positive impact on society. In fiscal year 2024, we published ***our inaugural annual Responsible AI Transparency Report that provides insight into how we build applications that use generative AI; make decisions and oversee the deployment of those applications; support our customers as they build their own generative applications***; and learn, evolve, and grow as a responsible AI community.

74.     The 2024 Proxy Statement included several shareholder proposals (Proposals 7, 8, and 9) that expressed concerns regarding the risks of generative AI, including reports on clean energy use for AI, liability risks, and AI data sourcing accountability. Shareholder Proposal No. 9 specifically raised the following concern: "Microsoft employs generative AI models developed by OpenAI, which allegedly stole large amounts of personal information by scraping the web, including private information and private conversations, medical data, information about children — essentially every piece of data exchanged on the internet it could take — without notice to the owners or users of such data, much less with anyone's permission."[3]  The proposal also noted that "Microsoft and OpenAI have been sued by the New York Times, among others, which alleged copyright infringement."[4]  The proposal also stated that "Prioritizing data ethics in Microsoft's AI development may help avoid harmful fiduciary and regulatory consequences. Americans surveyed by Pew Research Center have expressed that data privacy and usage are among their main concerns with Big Tech's AI initiatives."

75.     The Director Defendants, however, recommended voting AGAINST these proposals, stating that the Company's current "Responsible AI" frameworks and existing

---

[2] *See* 2024 Proxy at p. 11.

[3] *See* 2024 Proxy at p. 87.

[4] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

transparency reports made them unnecessary. The Proxy Statement further unequivocally represented that Microsoft operated its AI programs in "*a manner consistent with global copyright laws*" and that "*We train on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners*."[5] It also stated that "We sometimes train on synthetic datasets. These we create by prompting large language models to generate specific requested output before reviewing and filtering the results to ensure they are of sufficient quality to be part of the training dataset."[6]

76. In urging shareholders to oppose Proposal No. 9 at the 2024 Annual Meeting, the Director Defendants also approved representations in the proxy which stated that Microsoft respects standards like robots.txt and tags such as NO ARCHIVE. The 2024 Proxy further stated Microsoft has shared controls for website owners to opt-out of having their content used for AI training. The 2024 Proxy also stated that Microsoft will comply with the EU AI Act (specifically Article 53), which will require publishing detailed summaries of training content starting in August 2025.[7]

77. On January 29, 2025, Microsoft hosted an earnings conference call with analysts and investors to discuss the Company's Q3 2025 results hosted by CEO Nadella and CFO Hood. Nadella was asked "any sense of what percent of inference done on Azure will be done on proprietary models versus open models? And with that said, does it matter to Microsoft at the end of the day?" Nadella responded by falsely claiming that Microsoft was appropriately investing "for any workload":

> [W]hat you're seeing is effectively lots of models that get used in any application. When you look underneath even a copilot or a GitHub Copilot or what have you, you already see lots of many different models. You build models, you finetune models, you distill models. Some of them are models that you distill into an open source model. There's going to be a combination.
>
> We've always maintained that it's always good to have frontier models. You want to always build your application with high ambition using the best model that is available, and then optimize from there on.

[5] *See* 2024 Proxy at p. 88.

[6] *Id.*

[7] *Id.* at p. 89.

21

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

That's also another side. There's a temporality to it. What you start with as a given COGS profile doesn't need to be the end, because you continuously optimize for latency and COGS and putting in different models. And in fact, all that complexity, by the way, has to be managed by a new app server. One of the things that we are investing heavily on is Foundry, because from an app developer perspective, you want to keep pace with this flurry of models that are coming in. And you want to have an evergreen way for your application to benefit from all that innovation, but not have all the dev costs or the DevOps cost or what people talk about AI ops costs.

We are also investing significantly in all the app server for any workload to be able to benefit from all these different models, open source, closed source, different weight classes, and at the same time, from an operations perspective, it's faster, easier for you.

78.    After market hours on April 30, 2025, Microsoft issued a release providing the Company's financial results for its fiscal third quarter ended March 31, 2025 ("Q3 2025"). The release stated that during the quarter, Microsoft generated $26.8 billion in Intelligent Cloud revenue, a 21% increase, "driven by Azure and other cloud services revenue growth of 33%." The release quoted CEO Nadella as stating: "'Cloud and AI are the essential inputs for every business to expand output, reduce costs, and accelerate growth . . . From AI infra and platforms to apps, we are innovating across the stack to deliver for our customers.'"

79.    Also on April 30, 2025, Microsoft filed with the SEC a Q3 2025 quarterly report on Form 10-Q, which was signed by CEO Nadella and CFO Hood who attested to the report's accuracy and material completeness. The Form 10-Q contained the same financial information regarding Microsoft's Azure and Intelligent Cloud offerings contained in the Q3 2025 release. The Form 10-Q further stated: "Azure and other cloud services revenue grew 33% driven by demand for our portfolio of services, including 16 points from our AI services."

80.    That same day, Microsoft hosted an earnings conference call with analysts and investors to discuss the Company's Q3 2025 results hosted by CEO Nadella and CFO Hood. In his prepared remarks, CEO Nadella represented that Microsoft "continue[s] to win new customers with best-in-class AI capabilities." In particular, CEO Nadella highlighted purported advancements in Copilot and its growing adoption by consumers and businesses alike, stating:

22

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

> ***Microsoft 365 Copilot is built to facilitate human agent collaboration***, hundreds of thousands of customers across geographies and industries now use Copilot, *up 3 times year-over-year*. ***Our overall deal size continues to grow***. ***In this quarter***, *we saw a record number of customers returning to buy more seats*. And we're going further. Just last week, we announced a major update, bringing together agents, notebooks, search and create into a new scaffolding for work.
>
> Our new researcher and analyst deep reasoning agents analyze vast amounts of web and enterprise data to deliver highly skilled expertise on demand directly within Copilot. Beyond horizontal knowledge work, we are introducing agents for every role and business process.
>
> Our sales agent turns contacts into qualified leads and with sales chat reps can quickly get up to speed on new accounts. [A]nd our customer service agent is deflecting customer inquiries and helping service reps resolve issues faster. With Copilot Studio, customers can extend Copilot and build their own agents with no code, low code.
>
> More than 230,000 organizations, including 90% of the Fortune 500 have already used Copilot Studio. With deep reasoning and agent flows in Copilot Studio, customers can build agents that perform more complex staff and also handle deterministic scenarios like document processing and financial approvals.
>
> And they can now build computer use agents that take action on the UI across desktop and web apps. And with just a click, they can turn any SharePoint site into an agent, too. This quarter alone, customers created over 1 million custom agents across SharePoint and Copilot Studio, up 130% quarter-over-quarter.

81. In her prepared remarks, CFO Hood similarly claimed: "We continue to see strong demand for our cloud and AI offerings as they help customers drive productivity, increase efficiencies and grow their businesses." She highlighted the purported success of Copilot, stating: "ARPU growth was again driven by E5 and M365 Copilot." CFO Hood continued:

> ***With M365 Copilot, we continue to see growth across customer segments and geos***. *Paid M365 Commercial seats grew 7% year-over-year to over* $*430 million*. *While we continue to see installed base expansion across all customer segments*, growth was primarily driven by our small and medium business and frontline worker offerings.

82. On July 30, 2025, Microsoft issued a release providing the Company's financial results for its fiscal fourth quarter and year ended June 30, 2025 ("FY25"). The release stated that during the fourth quarter, Microsoft generated $29.9 billion in Intelligent Cloud revenue, a 26% increase, "driven by Azure and other cloud services revenue growth of 39%." The release quoted CEO Nadella as stating: "'Cloud and AI is the driving force of business transformation across every industry and sector . . . We're innovating across the tech stack to help customers adapt and grow in

23

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

this new era, and this year, Azure surpassed $75 billion in revenue, up 34 percent, driven by growth across all workloads.'"

83. Also on July 30, 2025, Microsoft filed with the SEC a FY25 annual report on Form 10-K, which was signed by CEO Nadella and CFO Hood who attested to the report's accuracy and material completeness. The Form 10-K contained the same financial information regarding Microsoft's Azure and Intelligent Cloud offerings contained in the FY25 release. The Form 10-K further stated: "Azure and other cloud services revenue grew 34% driven by demand for our portfolio of services."

84. That same day, Microsoft hosted an earnings conference call with analysts and investors to discuss the Company's FY25 results hosted by CEO Nadella and CFO Hood. In his prepared remarks, CEO Nadella claimed Microsoft was experiencing "record" enthusiasm for its Copilot products, stating:

> Talking about the app layer, these applications are becoming embedded in our daily work and life. Our family of Copilot apps has surpassed 100 million monthly active users across commercial and consumer. And when you take a broader look at the engagement of AI features across our products, we have over 800 million monthly active users.
>
> Microsoft 365 Copilot is becoming the new way to organize work and workflow and work artifacts. We rolled out our biggest update to Microsoft 365 Copilot to date this quarter, bringing together chat, search, create, notebooks as well as agents into one intuitive scaffolding. ***With this innovation and continued product improvements***, ***we are seeing real momentum***. ***Customers continue to adopt Copilot at a faster rate than any other new Microsoft 365 suite***, ***with strong usage intensity as shown by our week-over-week retention***. ***And we saw the largest quarter of seat ads since launch with a record number of customers returning to buy more seats***.

85. On September 10, 2025, Microsoft's AI CMO Spataro presented at the Goldman Sachs Communacopia & Technology Conference. AI CMO Spataro spoke extensively about the purported benefits of Copilot and its widespread adoption by Microsoft customers, claiming "we feel great about what we can do" through Copilot to "improve efficiency by 20% to 30%." He gave several examples of purported real-world efficiency gains, characterizing them as "just real nuts and bolts." AI CMO Spataro continued: "It may not be the most exciting thing to talk about, but at Microsoft, we're saving a lot of money, and we see our customers doing it as well."

24

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7ᵗʰ Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

86.     When asked by the interviewer how Copilot was doing in the market, AI CMO Spataro represented "that 70% of the Fortune 500 are using Copilot in a pretty extensive way, and those are lands, and we're expanding from there." He further claimed: "This past quarter, when we reported, it was our best quarter ever both in terms of seat adds for Copilot and the number of customers." Similarly, when asked how "Copilot usage tracked relative to your expectations," AI CMO Spataro responded that Copilot "still is our fastest-growing M365 portfolio product that we've ever had. And that's saying something because M3 and ME 5, like those are big important products that continue to really grow."

87.     On October 21, 2025, Microsoft filed its 2025 Proxy Statement, which was filed with the SEC and distributed to Microsoft shareholders in advance of the Company's 2025 Annual Meeting of shareholders, which was held December 5, 2025.  The Proxy Statement was reviewed and approved by each of the Individual Defendants.

88.     The 2025 Proxy again emphasized the Board's direct oversight responsibility for Microsoft's AI strategy, stating:



**AI Strategy, Governance, and Regulation**

*The Board maintains direct oversight over AI strategy risk. Our Environmental, Social, and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs*. The Committee receives and provides feedback on regular updates from management regarding Microsoft's ability to design, build, use, and access AI in a way that is responsible and meets customer expectations and regulatory requirements.

89.     The 2025 Proxy Statement heavily touted Microsoft's "leadership in artificial intelligence" and stated that Satya Nadella and his team had positioned the company as a "clear artificial intelligence leader," representing that:

Our exceptional fiscal year 2025 results demonstrate that Satya Nadella and his leadership team have positioned Microsoft as a clear artificial intelligence leader for

25

SHAREHOLDER DERIVATIVE COMPLAINT

this generational technology shift, enabling Microsoft to drive long-term growth through innovation, security, and quality.

90.   Microsoft's 2025 Proxy Statement represented to shareholders that Microsoft did not violate any federal copyright laws with respect to development and training of its AI software, AI generative models, and products, stating:

- "Generative AI Models — Microsoft uses a variety of data sources, including *publicly available information*, in a manner consistent with global copyright laws."

- "*We do not train on data from domains listed in the Office of the United States Trade Representative Notorious Markets for Counterfeiting and Piracy list*."

- "*We train on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners*."[8]

91.   The 2025 Proxy highlighted that the "family of Copilot apps" had surpassed 100 million monthly active users and that more than 230,000 organizations are using Copilot Studio. The Proxy highlighted the following AI successes realized by Microsoft in bullet format:

- Furthered adoption of our family of Copilot apps, with Copilot apps surpassing 100 million monthly active users.

- Launched Azure AI Foundry, helping customers design, customize, and manage AI applications and agents at scale, supporting more than 70,000 customers, including 80% of the Fortune 500.

92.   The 2025 Proxy also touted the alleged success of Microsoft 365 and Copilot, stating:

**Microsoft 365**

Under Mr. Nadella's leadership, Microsoft has developed Microsoft 365 ("M365") into a comprehensive, cloud-based productivity suite enhanced by AI and designed to meet the diverse needs of users. With over 430 million M365 Commercial paid seats and 89 million M365 consumer subscribers, M365 continues to demonstrate strong adoption. AI will further enhance M365's ability to make customers more productive. Microsoft 365 Copilot brings together next-generation AI with business data in the Microsoft Graph, and now includes Researcher and Analyst agents, all within the applications that millions of people use every day as it transforms work, workflow, and work artifacts.

---

[8] 2025 Proxy at p. 82.

26

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

**Copilot Studio**. Launched in fiscal year 2024, Copilot Studio empowers customers to become creators of AI solutions, equipping them with the capabilities to build, customize, and scale intelligent agents tailored to their business needs. Just as Power Platform made app creation easier, Copilot Studio brings a no-code approach to creating custom AI "copilots" tailored to specific workflows or industries. Users can configure an AI agent with natural language instructions and connect it to their internal data or apps via pre-built plugins, all without writing code. ***More than 230,000 organizations***, ***including 90% of Fortune 500 companies***, ***have used Copilot Studio, building 3 million custom AI agents across SharePoint and Copilot Studio***.

93. The 2025 Proxy Statement also stated that Microsoft's massive spending was a proactive "AI-first platform focus." It notes that Microsoft invested over $88 billion in capital expenditures in fiscal year 2025 ***to support customer demand*** and added over two gigawatts of capacity, stating that Microsoft had:

> ***Invested over*** $***88 billion in capital expense to support customer demand signals, driving commercial bookings of over*** $***100 billion in Q4***.

94. The 2025 Proxy stated that ***the Board maintains direct oversight over*** "***Software and Services Quality and Availability***," ***receiving regular updates on product resiliency***. It also described Azure AI Foundry as offering "best-in-class development tools."

95. The 2025 Proxy also represented to shareholders that Defendant Nadella was doing an excellent job driving Microsoft's AI strategy, warranting awarding Nadella a high operational performance rating (151.67% payout), citing his "thoughtful leadership" in advancing AI and cybersecurity.

96. The 2025 Proxy Statement included several shareholder proposals (Proposals 5, 6, and 7) that expressed concerns regarding the risks of generative AI, including reports on GenAI bias, censorship risks, and data usage oversight. Shareholder Proposal No. 7 specifically raised the following concern: "Microsoft employs generative AI models developed by OpenAI, which allegedly stole large amounts of personal information by scraping the web, including private information and private conversations, medical data, information about children — essentially every piece of data exchanged on the internet it could take — without notice to the owners or users of such data, much less with anyone's permission."[9] The proposal also noted that "Microsoft and

---

[9] *See* 2025 Proxy at p. 81.

27

SHAREHOLDER DERIVATIVE COMPLAINT

OpenAI have been sued by the New York Times, among others, which alleged copyright infringement."[10]

97.    The Director Defendants, however, recommended voting AGAINST these proposals, stating that the Company's current "Responsible AI" frameworks and existing transparency reports made them unnecessary.  If further unequivocally represented that Microsoft operated its Ai programs in "***a manner consistent with global copyright laws***" and that "***We train on data that we gain access to*** (***such as archives and metadata***) ***through negotiated arrangements with publishers and copyright owners***."[11]

98.    In urging shareholders to oppose Proposal No. 7 at the 2025 Annual Meeting, the Director Defendants also approved representations in the proxy that Microsoft respects standards like robots.txt and tags such as NO ARCHIVE. The 2025 Proxy further stated Microsoft has shared controls for website owners to opt-out of having their content used for AI training.  The Proxy also stated that Microsoft will comply with the EU AI Act (specifically Article 53), which will require publishing detailed summaries of training content starting in August 2025.[12]  The Company also noted that during fiscal year 2025 (July 1, 2024 to June 30, 2025), it had engaged in direct outreach efforts to shareholders owning over 35% of the Company's stock on these issues, and specifically to discuss its AI training practices and how it navigates global legal frameworks, stating "During fiscal year 2025, we approached investors holding over 35% of Microsoft's shares to discuss our practices and the status of different legal frameworks around the world that relate to training AI models."[13]  It also noted that between late 2024 and May 2025, Microsoft engaged with the National Legal and Policy Center (the proponent of shareholder proposals regarding AI data ethics) to share updates on its approach and transparency reporting.

99.    On October 29, 2025, Microsoft issued a release providing the Company's financial results for its fiscal first quarter ended June 30, 2025 ("1Q26"). The release stated that during the

---

[10] *Id.*

[11] *See* 2025 Proxy at p. 82.

[12] *Id.* at p. 83.

[13] *Id.*

28

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

quarter, Microsoft generated $30.9 billion in Intelligent Cloud revenue, a 28% increase, while "Azure and other cloud services revenue increased 40%." The release quoted CEO Nadella as stating: "'Our planet-scale cloud and AI factory, together with Copilots across high value domains, is driving broad diffusion and real-world impact . . . It's why we continue to increase our investments in AI across both capital and talent to meet the massive opportunity ahead.'" CFO Hood added: "'We delivered a strong start to the fiscal year, exceeding expectations across revenue, operating income, and earnings per share . . . Continued strength in the Microsoft Cloud reflects the growing customer demand for our differentiated platform.'"

100.    Also on October 29, 2025, Microsoft filed with the SEC a Q1 2026 quarterly report on Form 10-Q, which was signed by CEO Nadella and CFO Hood who attested to the report's accuracy and material completeness. The Form 10-Q contained the same financial information regarding Microsoft's Azure and Intelligent Cloud offerings contained in the Q1 2026 release. The Form 10-Q continued: "Azure and other cloud services revenue grew 40% driven by demand for our portfolio of services with continued growth across all workloads."

101.    That same day, Microsoft hosted an earnings conference call with analysts and investors to discuss the Company's Q1 2026 results hosted by CEO Nadella and CFO Hood. In his prepared remarks, CEO Nadella touted the recently announced restructuring of Microsoft's partnership with OpenAI and the Company's purportedly market-leading AI capabilities, stating:

> And as you saw yesterday, we closed a new definitive agreement with OpenAI, marking the next chapter in what is one of the most successful partnerships and investments our industry has ever seen. This is a great milestone for both companies, and we continue to benefit mutually from each other's growth across multiple dimensions.
>
> Already, we have roughly 10x-ed our investment. OpenAI has contracted an incremental $250 billion of Azure services, our rev share, exclusive IP rights and API exclusivity for Azure continue until AGI or through 2030. And we have extended the model and product IP rights through 2032. And we are also energized to innovate and pursue AI advancements with both talent and compute investments that have real-world impact.
>
> With that, let's turn to our momentum across our AI platform and Copilots as well as with agents. ***We have the most expansive data center fleet for the AI era, and we are adding capacity at an unprecedented scale. We will increase our total AI capacity by over 80% this year and roughly double our total data center footprint over the next two years, reflecting the demand signals we see***. Just this

29

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

quarter, we announced the world's most powerful AI data center, Fairwater in Wisconsin, which will go online next year and scale to 2 gigawatts alone.

And we have deployed the world's first large-scale cluster of NVIDIA GB300s. We are building a fungible fleet that's been continuously modernized and spans all stages of the AI life cycle from pretraining to post training to synthetic data generation and inference. And it also goes beyond GenAI workloads to recommendation engines, databases, and streaming. *We're optimizing this fleet across silicon systems and software to maximize performance and efficiency*.

102.    During the call, Defendant Nadella elaborated on the purported demand and capabilities of Copilot, calling Copilot "best-in-class" according to multiple third-party benchmarks:

> *We are seeing increasing demand and diffusion of our AI platform and family of Copilots*, *which is fueling our investments across both capital and talent*.
>
> * * *
>
> Now let's turn to applications and agents we ourselves are building on this platform. We now have 900 million monthly active users of our AI features across our products. And our first-party family of Copilots now has surpassed 150 million monthly active users across the information work, coding, security, science, health, and consumer.
>
> When it comes to information work, we continue to innovate with Microsoft 365 Copilot. *Copilot is becoming the UI for the agentic AI experience*. We have integrated chat and agentic workflows into everyday tools like Outlook, Word, Excel, PowerPoint, and Teams. *Just nine months since release*, *tens of millions of users across Microsoft 365 customer base are already using chat. Adoption is accelerating rapidly*, *growing 50% quarter over quarter*, *and we continue to see usage intensity increase*.
>
> This quarter, we also introduced agent mode, which turns single prompts into export quality Word documents, Excel spreadsheets, PowerPoint presentation and then iterate to deliver the final product much like agent mode in coding tools today. *We're thrilled by the early response*, *including third-party benchmarks that rank it best-in-class*.
>
> Beyond individual productivity, Copilot is multiplayer, (technical difficulty) agents like Facilitator and Project Manager, prep meeting agendas, take notes, capture decision, kick off group tasks.
>
> We are seeing a growing Copilot agent ecosystem with top ISVs like Microsoft, Asana, Jira, LexisNexis, SAP, ServiceNow, Snowflake and Workday, all building their own agents that connect to Copilot. And customers are also building agents for their mission-critical business processes and workflows using tools like Copilot Studio and integrating them into Copilot.
>
> The overall number of agent users doubled quarter over quarter. And just yesterday, we announced App Builder, a new Copilot agent that lets anyone create and deploy task-specific apps and agents in minutes grounded in Microsoft 365 context.

30

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

*All this innovation is driving our momentum. Customers continue to adopt Microsoft 365 Copilot at a faster rate than any other new Microsoft 365 suite, all up more than 90% of the Fortune 500 now use Microsoft 365 Copilot, Accenture, Bristol-Myers Squibb, EY Global and the UK's Tax and Payments and Customs Authority all purchased over 15,000 seats this quarter. Lloyds Banking Group has deployed 30,000 seats, saving each employee an average of 46 minutes daily.*

*And a large majority of our enterprise customers continue to come back to purchase more seats. Our partner, PwC, alone added 155,000 seats this quarter and now has over 200,000 deployed across its global operations. In just six months, PwC employees interacted with Microsoft 365 Copilot over 30 million times, and they credit this identic transformation with saving millions of hours in employee productivity.*

103. On December 2, 2025, Microsoft's EVP E&D Jha presented at the UBS Global Technology and AI Conference. When he was asked about consumer adoption of Copilot, EVP E&D Jha responded that the "intensity" of Copilot usage was increasing, stating:

As we recently disclosed, *two quarters in a row, the daily active engagement with Copilot has more than doubled, quarter over quarter. That, to me, is a real sign of product with increased intensity of usage and more users engaging with the Copilot experience.*

*Another one I would point to: Maybe a couple of quarters ago, we said, what, 70% of the Fortune 500 had Copilot. Now, that's up to 90%.*

I do think the ARPU growth is a good one to think about. As we discussed, most of our seat growth today is in lower ARPU base: small businesses, first-line workers. *The fact that our ARPU growth has been stable, Copilot is a contributor to that.*

104. Later, in response to a question about Copilot's trajectory, EVP E&D Jha represented that there were several "things that are already elevating the capabilities of Copilot," continuing:

I think the first is *the reasoning model finally unlocks AI and graphical user interfaces to work much more effectively.* I'm very excited in the January, February timeframe. You're going to see agent mode inside of Office, inside of Excel, inside of Word, inside of PowerPoint, in your calendar, in your meeting, inside your Teams channel. That is going to be a big one.

It's one thing to go and say there's AI off on the side, which I think is a very interesting user experience because you get to express your intent in a natural language, but then, to be able to take that same capability and bring that to existing workflows that hundreds of millions of people are already on with a graphical user interface and have those two coexist, I think the agent mode is going to be a big unlock. That's thing 1.

31

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

The second thing is what we talked about: enabling more Agentic workflows. This is where Agent 365 as a governance and a compliance plane enables customers to go without the worry of a sprawl or a management issue on their hands.

Finally, with Copilot, we brought multiple sources of intelligence into Copilot. Just like if I hire an employee with liberal arts background to work on a project and I hire an employee with a STEM background to work on a project, they're going to bring different strengths. *And so with Copilot, it's not just about the model. It's about how the models come together with the graphical user interface, the innate capabilities of the model, multiple lineages of the model to actually deliver the outcome or the workflow that you're planning to go do, whether in our applications or agents that you will build on your own.*

105.    Defendant Jha, in response to an analyst's question about competitive threats for Copilot, and specifically Google's Gemini, represented that Copilot offered numerous unique differentiators and consistently outperformed the competition, stating:

Let me first just say, look, with — let me talk about Copilot, what's differentiated, what's unique?

*The first thing we got to do is to make sure we meet users' expectations with what they expect Generative AI to do: be a great writer, be a great analyzer, be able to tell you the weather, create an image, and all of that stuff.*

*That's [table stakes]. We're going to go do that. We're going to be competitive like any other Gen AI tool on that.*

Now, let's talk about what's unique and what's differentiated.

The first thing is what we call Work IQ, which is understanding your work context. Most of the people powering economic activity around the globe are on M365. Work IQ gives us a pretty good understanding of the projects that matter to you, who your work group is, what events are interesting, who are your customers, your e-mails, your meetings, your documents. We have a pretty good understanding of that stuff.

Then, you'll hear the other tools talk about connectors. Connector is trying to drink through a very thin straw and understand your work context. Now, you can take many sips from a thin straw, it is still a thin straw.

*And so we have customers who've done side-by-side analysis of Copilot in the context of your work and connector-based things and the gap is very significant and growing. Anyway, that's just thing one.*

Thing two, though, as people use Copilot, both as a new endpoint, as a peer to what Excel, PowerPoint, Outlook, Teams — as a pure endpoint. But they have billions of transactions every hour that go through these applications.

We have an opportunity to serve the same Work IQ intelligence with agent mode inside of these existing applications that people use. *We can uniquely do that well.* That's thing two.

32

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

Thing three, human-to-human collaboration, communication, productivity, highly regulated. We have 15 years' experience on how to do eDiscovery, sensitivity label, all sorts of things, legal hold, data classification, data governance.

All of that works with human-to-AI conversations in Copilot automatically for customers. Our 15 years of maturity on that stuff is enterprise-grade maturity and human-to-human productivity. Human and AI productivity gets all of that for free. The other providers are going to have to go build all of that capability.

Thing 4, can I keep going or you can keep coming?

Thing 4, though, it's, like, can I go back to — we are not beholden to a model, we are beholden to the best outcome. And so we will build experiences that are powered by whether it be our IP partner, OpenAI, whether it be Anthropic, whether it be Copilot tuning, whether it be an open source model whose weights you want to go create as your own unique IP. We are multi-model.

Finally, the more important thing that — and I go back to the comment I made earlier, if you think that the future workforce is going to have more agents than humans — (inaudible) this is going to be true in every organization, how is the human supposed to get work?

I thought that the beauty of AI was I don't have to worry about tools anymore. I have one natural language interface that abstracts away the tools and I express my intent.

In a world where, now, I'm surrounded by hundreds of agents that are semi-autonomous, some that I'm managing, some that I have to rendezvous with, how does a human navigate all of that stuff?

***Copilot is going to be the UI through which they orchestrate the agent***. ***We are going to be the search engine for these agents***. ***We're going to be the relevance engine for these agents***. ***We're going to be the orchestration engine for these agents***.

IT is going to have a bunch of controls. Karl, you're in this department. These following agents are the most relevant to you. Your work group will create an agent that you tend to use a lot. Copilot will know to use that.

So when you put all of these things together, I really like our ability to go serve M365 customers with M365 Copilot.

106. On December 5, 2025, Microsoft held its Annual Shareholders Meeting, which was hosted by CEO Nadella, CFO Hood, and other Microsoft executives. During the meeting, CEO Nadella highlighted the purported "major advances in AI innovation" that had occurred in Microsoft's "family of Copilots." CFO Hood similarly emphasized Microsoft Windows' purported "best in class AI capabilities."

33

SHAREHOLDER DERIVATIVE COMPLAINT

107.    Microsoft executives also provided examples of these claimed capabilities. For example, Microsoft 365 Copilot Director Callie August claimed that "Copilot doesn't just access your work data, it actually understands it." She continued: "We call this work IQ, and it's the intelligence layer behind Microsoft 365 Copilot and agents that helps Copilot understand you, your job, and your company. This enables Copilot to give you more accurate, relevant, and personalized responses."

108.    Defendant Nadella also discussed the AI-readiness of the Company's cloud infrastructure, stating it was already "obviously at scale and building out rapidly":

> *So for example, our infrastructure business, one of the great opportunities we now get is to build out our cloud infrastructure so that it's AI ready for what is going to be the token factories or the intelligence factories. So that's sort of our number one priority. We're obviously at scale and building out rapidly.* The layer above that. Is you want to use these token factories to create AI agents, so there's a new app server being born, and that's where things like Foundry and GitHub Copilot and all come together so that we can then enable our developers and you know our partners to build great agents.
>
> And then the layer above that is where the high value domains in which we, have always participated, information work, right? That's where Microsoft 365 Copilot comes in. Software development with Gitup Copilot or security Copilot or what we're doing in business applications and of course in the consumer space, so we're taking a pretty full stack approach, but the real goal is for not only for us to reimagine the current categories and also build new extensions.

109.    The statements referenced in ¶¶ 58-93 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to Defendants or recklessly disregarded by them as follows:

(a)    that Microsoft had violated federal copyright laws in the formulation of its AI strategy and its partnership with AI companies like OpenAI;

(b)    that Microsoft had violated BIPA in establishing commercial voice AI products using the voices of real people;

(c)    that Microsoft's Copilot software had experienced major undisclosed problems with brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability;

34

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

(d)     that Microsoft's proprietary AI model was performing well below competitors on a number of benchmark tests;

(e)     that Microsoft needed to increase its capital expenditures by billions of dollars and divert GPU and CPU capacity away from fulfilling demand for its profitable Azure services in order to improve the competitive positioning of its Copilot software and increase its AI-related R&D; and

(f)     that, as a result of (a)-(d) above, Microsoft had failed to convert a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and the Company's Copilot offerings had lost market share to rival products, a trend that was increasing.

110.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

111.     The failure of Microsoft's periodic SEC filings to disclose the problems detailed herein regarding the development and customer adoption of Copilot products and Microsoft's proprietary AI models violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Microsoft stock speculative or risky. Indeed, the risk disclosures contained in Microsoft's periodic SEC filings were themselves materially misleading, presenting potential, future contingent risks as mere possibilities (*e.g.*, "[i]neffective or inadequate AI development or deployment practices by Microsoft or others ***could*** result in incidents that impair the acceptance of AI solutions, cause harm to individuals, customers, or society, or result in our products and services not working as intended"), while concealing adverse developments in

35

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

Microsoft's Copilot products and services and other AI-related offerings that had already occurred and making the numerous affirmative misrepresentations about those same products and services detailed herein.

**DISCLOSURE OF THE TRUTH**

112.   On January 28, 2026, Microsoft announced disappointing results for its fiscal second quarter ended December 31, 2025 ("Q2 2026"). First, during the quarter Microsoft's Azure growth had slowed suddenly and fallen below analyst expectations. During the related earnings call, CFO Hood revealed that the slower Azure growth was primarily due to computational capacity constraints, as the Company had diverted central processing unit ("CPU") and graphics processing unit ("GPU") capacity to Copilot applications and AI-related research and development ("R&D"). Second, Microsoft revealed that its capital expenditures had increased to $37.5 billion during the quarter, causing the Company's capital expenditures for the first six months of its fiscal 2026 to balloon to $72.4 billion compared to $88.2 billion for *all* of Microsoft's fiscal 2025. The reason for the dramatic growth in capital expenditures was again largely attributed to AI-related R&D and Copilot development and capacity buildout costs. Third, Microsoft revealed, for the first time, that the number of paid Microsoft 365 Copilot seats totaled only 15 million to date, materially below analyst estimates and a fraction of the more than 450 million commercial Microsoft 365 users.

113.   On this news, the price of Microsoft shares declined over $48 per share, from $481.63 per share at market close share on January 28, 2026 to $433.50 per share at market close on January 29, 2026, on abnormally high trading volume of nearly 129 million shares traded.

114.   On February 3, 2026, *The Wall Street Journal* revealed, in an article titled "Microsoft's Pivotal AI Product Is Running Into Big Problems," that severe challenges and functionality issues had plagued Microsoft's Copilot offerings, leading to Copilot losing market share during the relevant time period to competing products such as Google's Gemini. The article reported that "[c]onfusing brand positioning and interoperability problems have frustrated users, current and former employees who have worked on Microsoft's AI products said" and that "[o]nly a small proportion of subscribers to Microsoft's enterprise suite use Copilot, and the percentage

36

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

who favor it over Google's Gemini or other tools has decreased in recent months." The article continued:

> Previously unreported data shows that Copilot subscribers, including those with corporate accounts, are increasingly favoring competing options.
>
> From last July through late January, the percentage of Copilot subscribers who use the product as a primary option decreased from 18.8% to 11.5%, according to a survey of more than 150,000 respondents in the U.S. by market research firm Recon Analytics. This happened while the share of paid users who choose Google's Gemini as the first option increased from 12.8% to 15.7%.
>
> * * *
>
> Those surveyed who switched from Copilot said they found better quality elsewhere, with some citing poor user experience and restrictive usage limits. Workers who have access to subscriptions for Copilot, ChatGPT and Gemini choose ChatGPT and Gemini at a higher rate than Copilot, the Recon data shows.
>
> Some companies are using only about 10% of the Copilot subscription seats they are paying for, according to a recent note by analysts at Citi Research. "Disorganized data silos" have been an issue for Copilot, analysts wrote.
>
> * * *
>
> Customer surveys by Microsoft have shown that users have been confused by the multiple versions of Copilot, people familiar with the matter said. Some users have long complained about Copilot being forced onto them, popping up on everything from documents to the browser.
>
> One issue cited by current and former employees is the lack of a cohesive experience across the different Copilots, a user pain point Nadella has flagged in the past. About a year ago, Nadella sent a frustrated email to Rajesh Jha, executive vice president of experiences and devices, detailing an incident in which Nadella had asked the enterprise version of Copilot on the Edge browser to help with a public webpage he was on, but it couldn't fulfill his prompt, according to people familiar with the email.
>
> * * *
>
> Some employees said an organizational silo between Suleyman's consumer-focused team and teams working on enterprise versions has made it challenging to achieve a unified vision.
>
> The effort to train proprietary models has also been hampered by a shortage of computing capacity, with the company rationing server time to ensure availability for OpenAI and other customers of its Azure cloud service. On a number of benchmark tests, Microsoft's flagship proprietary AI model ranks well below competitors.

115.    The price of Microsoft stock continued to fall in the days after Microsoft's 2Q26 earnings announcement as the market continued to digest the adverse news and sources such as *The*

37

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

*Wall Street Journal* revealed new adverse information, falling below $393 per share on February 5, 2026.

116.    On February 11, 2026, analysts at Melius Research LLC published a research note linking Microsoft's decision to divert Azure capacity to fix apparent flaws in Copilot as a "no-win situation" that was likely to plague the Company for the foreseeable future. The analysts wrote that "Copilot Woes and Azure are Linked" and that "the better the AI assistants get from competitors, the more Microsoft will seem behind in Copilot and its other AI tools — and then will need to spend more to invest in them, consuming the upside in Azure for their own purposes."

117.    On March 17, 2026, *The Wall Street Journal* revealed in an article titled "Microsoft Seeks More Coherence in AI Efforts With Copilot Reorganization" that Microsoft was reorganizing its Copilot product teams to unify commercial and consumer versions partly in response to the challenges revealed by *The Wall Street Journal*'s prior reporting on Copilot's problem-plagued development and disappointing customer adoption.

118.    As a result of this news, price of Microsoft stock continued to fall, dropping to a low of just $380 per share by March 20, 2026 – 30% below the relevant time period high.

119.    On April 29, 2026, Microsoft announced results for its fiscal third quarter ended March 31, 2026. During the accompanying earnings call, Defendant Hood revealed that the Company had increased its planned capital expenditures for calendar 2026 to $190 billion, $37 billion more than analyst expectations according to BofA Securities.

120.    On June 2, 2026, Evercore hosted Microsoft's CFO of Commercial Products and Infrastructure Mat McBride ("McBride") at its TMT Conference. During the interview, McBride was asked about the "perception that Copilot's not delivering what people want." In response, McBride stated the Company had been working to "improve[] the product rapidly over the last year," which included the launch of "625 new features," such that the "product is way different than it was 90 days ago."

121.    Despite these purported improvements, Copilot has continued to lose market share according to third-party tracking services. For example, according to First Page Sage, which

38

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

describes itself as "an SEO and thought leadership marketing company with offices throughout the U.S.," Copilot held an 8.7% market share among top generative AI chatbots in June 2026, down significantly from Copilot's 14.3% market share in June 2025 as measured by the service. According to First Page Sage, during this time period Copilot fell from the second most used generative AI chatbot by market share to the fourth most used generative AI chatbot.

## VI.   ALLEGATIONS DEMONSTRATING DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF THE TRUE FACTS

122.   As alleged herein, Defendants either knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the relevant time period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents. Defendants, by virtue of their receipt of information reflecting the true facts regarding Microsoft, and their control over and/or receipt and/or modification of Microsoft's allegedly materially misleading misstatements, were active and culpable participants in the wrongdoing alleged herein.

123.   Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. Accordingly, the false statements described herein could not have been perpetrated during the relevant time period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

124.   The Individual Defendants, because of their positions with Microsoft, controlled the contents of Microsoft's public statements during the relevant time period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the

39

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

defendants is responsible for the accuracy of Microsoft's corporate statements and is, therefore, responsible and liable for the representations contained therein.

125. Moreover, the Company's Proxy Statements admitted that the Board itself exercised direct oversight of the Company's AI strategy and frequently met with management concerning details of the strategy. *See, e.g.,* 2023 Proxy at p. 9: "For major initiatives, such as our approach to AI, the Board engages with management on strategic vision, investments, partnerships, capital requirements, and risks."

126. The Board's Environmental, Social, and Public Policy Committee also had responsibility for Microsoft's AI strategy, and specifically for reviewing and addressing responsible AI. The 2023 Proxy noted that "Microsoft's Environmental, Social, and Public Policy Committee provides oversight and guidance to management on responsible AI policies and programs." The members of that Committee during the relevant time period were:

Penny Pritzker – Chair

Reid Hoffman

John W. Stanton

Emma Walmsley

Mary MacGregor

127. Moreover, both the 2024 and 2025 Proxy Statements represented that "***The Board maintains direct oversight over AI strategy risk. Our Environmental, Social, and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs***."

128. In addition, the Individual Defendants were each personally involved in the development or supervision of Microsoft's Copilot offerings and/or customer adoption and repeatedly held themselves out to the market as the Microsoft executives most knowledgeable and competent to speak on such topics during discussions with investors, analysts, and the media. During McBride's June 2026 Evercore interview, for example, he described how the Company's most-senior leadership, which would include the Individual Defendants, methodically developed

40

SHAREHOLDER DERIVATIVE COMPLAINT

and oversaw the Company's AI infrastructure buildout in consultation with the Board given its scale, expected duration, and importance to the Company, likening the effort to prior cloud computing initiatives. Moreover, as documented by *The Wall Street Journal*'s reporting, the Individual Defendants were personally and directly involved in identifying and attempting to remediate the Copilot problems detailed herein, yet failed to accurately and timely disclose such issues to the market while simultaneously making the materially false and misleading statements attributed to them herein. As a result, there is a compelling inference that each Individual Defendant knew, or was reckless in not knowing, of their materially false and misleading nature at the time each statement was made that is at least as compelling as any non-culpable inference.

129. The Individual Defendants also had the motive and opportunity to engage in the wrongdoing. For example, Defendant Nadella sold over $75 million worth of Microsoft shares during the relevant time period at prices above $500 per share. These sales were suspicious in timing and amount, being in excess of defendant Nadella's insider trading practices in each of the three years preceding the sales, and at prices substantially above the price to which Microsoft stock fell after disclosure of the truth in 2026 following the corrective disclosures detailed herein.

## VII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

130. Plaintiff brings this action derivatively and for the benefit of Microsoft to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Microsoft, unjust enrichment, and violations of the Exchange Act.

131. Microsoft is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132. Plaintiff is, and has been at all relevant times, a shareholder of Microsoft. Plaintiff will adequately and fairly represent the interests of Microsoft in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

41

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    A pre-suit demand on the Board of Microsoft is futile and, therefore, excused. At the time this action was commenced, the Board consisted of the following Directors: Nadella, Di Sibio, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Rainey, Scharf, Stanton, and Walmsley. Since Microsoft has an odd-numbered board, Plaintiff needs to allege demand futility as to seven of the thirteen Directors that were on the Board at the time this action was filed.

135.    Delaware law applies a director-by-director "three-part test as the universal test for assessing whether demand should be futile." *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1057-58 (Del. 2021). The three-part test asks with respect to each Demand Director: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.*

**A.    Each Demand Director Faces a Substantial Likelihood of Personal Liability for Directly Participating in the Supervision of the $13 Billion Partnership With OpenAI, Pursuant to Which the Director Defendants Caused Microsoft to Jointly Develop the Infringing AI Systems**

136.    The second inquiry in the demand futility test under Delaware law is whether a director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. Here, each Demand Director faces a substantial likelihood of liability for directly participating in the wrongful conduct and/or breaching his or her oversight duties in bad faith.

137.    For a software company like Microsoft, intellectual property rights, including copyright and biometric information protection, is a ***mission critical issue*** to the Company. If third parties could violate Microsoft's copyright and biometric information protections willy-nilly,

42

SHAREHOLDER DERIVATIVE COMPLAINT

Microsoft's software would have no value and the Company's revenues would collapse. In a similar vein, if Microsoft violates the copyright and biometric rights of other companies or persons, it exposes itself to substantial damages. Even worse, if Microsoft's own software is developed in a manner that violates intellectual property rights, the consequences are dire, as Microsoft's software would be imbued with copyright biometric information violations, threating the Company's recurring revenues from its software, thereby not only exposing it to damages but also adversely impacting its revenues, profits, and growth rate. That is what happened here under the Director Defendants' watch.

138. Eleven of the Demand Directors — Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Scharf, Stanton, and Walmsley — have been on the Board of Directors at all relevant times, including during the time that Microsoft committed the copyright, BIPA, and IP violations, and all such Directors made the false and misleading statements and also caused Microsoft to make the stock repurchases.[14] Thus, all eleven Demand Directors are interested because they face a substantial likelihood of liability for each of the claims asserted herein.

139. The same eleven Directors also failed to act on numerous red flags related to Microsoft's copyright and IP infringement and BIPA violations. Even after Judge William Alsup issued a seminal order dated June 23, 2025, in *Bartz v. Anthropic*, No. 3:24-cv-05417-WHA (N.D. Cal.) which made it clear that there was a major difference between training AI systems based on legally acquired books and data and training such systems on pirated books and data, Microsoft's directors failed to cause Microsoft to comply with the law and permitted the unlawful training to continue. Judge Alsup's decision was the first federal court decision squarely addressing whether using copyrighted works to train a generative AI model can qualify as fair use. Judge Alsup reached two key conclusions:

1. Training on lawfully acquired books was "exceedingly transformative" and could constitute fair use under 17 U.S.C. § 107.

---

[14] Directors Rainey and Di Sibio only recently joined the Board, and thus Plaintiff excludes them from these allegations. Rainey joined the Microsoft Board in December 2025, and Di Sibio joined the board in May 2026.

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

2.     Downloading and maintaining millions of pirated books in Anthropic's central library was not protected by fair use, and the infringement claims based on those copies would proceed to trial.

140.     Second, the Director Defendants knew about or recklessly disregarded the unlawful copyright infringement and BIPA violations.  They were not passive participants but instead had direct oversight responsibility in Microsoft's massive, multi-billion investments in OpenAI and Anthropic.   Microsoft has been a co-developer, co-designer, and commercial partner that participated in the creation, training, deployment, and monetization of the infringing AI systems. Pursuant to those investments, Microsoft invested $13 billion in OpenAI, in exchange for which Microsoft is entitled to recover its investment through a large share of OpenAI Global's profits. Further, after repayment, Microsoft will retain a substantial continuing equity interest in OpenAI. As a result of these massive investments, which are highly material to Microsoft, the Director Defendants have been personally and directly involved in all aspects of the investment.

141.     Third, under the Director Defendants supervision and pursuant to their direct approval, Microsoft designed and built a bespoke Azure supercomputing environment specifically for OpenAI.  It then (1) engineered that infrastructure in collaboration with OpenAI; (2) optimized it for training large language models on internet-scale datasets; and (3) continues to operate that infrastructure during both training and inference. ***Under the Director Defendants' direct oversight***, ***Microsoft knowingly designed and operated the infrastructure used to ingest and process copyrighted material and commercialize voiceprints at scale***.

142.     Microsoft's cloud infrastructure was specifically designed to use "essentially the whole internet" and was developed "in collaboration with and exclusively for OpenAI" to train its AI models.  As a result, the Director Defendants knew or recklessly disregarded the fact that pirated books and data and commercialized voiceprints were being used to train the AI systems and software.

143.     Fourth, Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Rainey, Scharf, Stanton, and Walmsley personally approved the Company's 2025 Proxy

44

SHAREHOLDER DERIVATIVE COMPLAINT

Statement which contained false and misleading statements.

144.    As a result, Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Rainey, Scharf, Stanton, and Walmsley consciously ignored repeated red flags which demonstrated that the Company was engaging in large-scale violation of federal copyright and IP laws and BIPA laws.  For these reasons, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability for their wrong acts, such that demand on the Board to institute this action is excused as futile.

**B.    Each Demand Director Faces a Substantial Likelihood of Liability for Approving the Issuance of False and Misleading Public Statements**

145.    As explained above, Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Rainey, Scharf, Stanton, and Walmsley caused Microsoft to issue numerous false and misleading disclosures during the relevant time period.

146.    The Microsoft directors were ultimately responsible for the Company's public disclosures.  Directors Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzger, Rainey, Scharf, Stanton, and Walmsley approved one or more of the false and misleading statements alleged herein.

147.    The Director Defendants, together and individually, violated and breached their fiduciary duties of loyalty and acted in bad faith. The Director Defendants knowingly approved and/or permitted the wrongful conduct alleged herein and caused the Company to engage in copyright infringement and BIPA violation misconduct, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute the causes of action asserted herein.

148.    Each Demand Director had actual knowledge of the undisclosed material facts alleged herein and knowingly or consciously disregarded them in bad faith when approving the false and misleading statements.  The Demand Directors either knowingly or recklessly issued or

45

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

caused the Company to engage in copyright infringement and BIPA violation misconduct, and to issue the materially false and misleading statements alleged herein. The Director Defendants knowingly approved and/or permitted a business model to train Microsoft's AI products on a dataset that included copyrighted materials and commercialized voiceprints and knew of the falsity of the misleading statements in SEC filings at the time they were made. The Director Defendants thus face a substantial likelihood of liability and are not disinterested.

## C.    Defendant Nadella is Interested and Received Improper Financial Benefits

149.    Defendant Nadella has served as the CEO of the Company at relevant times and is not disinterested or independent. Nadella derived his sole employment income from Microsoft and does not qualify as an independent director, as Microsoft's proxy statements admit.

150.    Further, as alleged herein, Nadella was awarded unjust compensation in the aggregate amount of $224,115,510 million between 2023-25, as reflected in the following chart:

| Named Executive and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Non-equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| | 2025 | 2,500,000 | 0 | 84,245,496 | 9,555,000 | 196,294 | 96,496,790 |
| Satya Nadella | 2024 | 2,500,000 | 0 | 71,236,392 | 5,200,000 | 169,791 | 79,106,183 |
| | 2023 | 2,500,000 | 0 | 39,236,137 | 6,414,750 | 361,650 | 48,512,537 |

151.    As the Company's 2025 Proxy admits, Nadella's pay was completely out of proportion to that of every other employee of the Company. The Proxy states that "For fiscal year 2025, the annual total compensation for the median employee of the Company (other than our CEO) was $200,972 and the annual total compensation of our CEO was $96,496,790. Based on this information, for fiscal year 2025 *the ratio of the annual total compensation of our CEO to the annual total compensation of the median employee was 480 to 1*."

152.    Nadella's massive compensation was unjust because he breached his fiduciary duties, issued false and misleading statements, and manipulated the targets for his compensation.

46

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

He is therefore interested in the claims asserted herein and demand is clearly futile as to Nadella.

**D.      Demand is Futile as to the Audit Committee Directors**

153.    The Audit Committee Directors (Johnston (Chair), List, and Stanton) are not disinterested or independent, and therefore are incapable of considering a demand.  The Audit Committee Directors were responsible for assessing the adequacy and effectiveness of Microsoft's technology security policies, internal controls regarding compliance with federal copyright laws, information and technology security, cybersecurity, and privacy related areas, compliance with related legal, regulatory and ethical requirements, and public disclosure requirements. The Audit Committee Directors breached their fiduciary duties to the Company by allowing Microsoft to engage in copyright violations and by failing to prevent and correct such violations after they occurred, thus exposing the Company to substantial damages.  The Audit Committee Directors therefore cannot independently consider any demand to sue themselves for breaching their fiduciary duties and committing violations of the 1934 Act.

**E.      Demand is Futile as to Directors Pritzger, Hoffman, Stanton, Walmsley, and MacGregor**

154.    The Company's Proxy Statements admitted that the full Board exercised direct oversight of the Company's oversight strategy, and frequently met with management concerning details of the strategy. *See, e.g.,* 2023 Proxy at p. 9: "For major initiatives, such as our approach to AI, the Board engages with management on strategic vision, investments, partnerships, capital requirements, and risks."

155.    Thus, all eleven Director Defendants are interested with respect to the key allegations in this complaint.  Moreover, however, the Board's Environmental, Social, and Public Policy Committee also had responsibility for Microsoft's AI strategy, and specifically for reviewing and addressing responsible AI.  The 2023 Proxy noted that "Microsoft's Environmental, Social, and Public Policy Committee provides oversight and guidance to management on responsible AI policies and programs."  The members of that Committee during the relevant time period were:

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

Penny Pritzker – Chair

Reid Hoffman

John W. Stanton

Emma Walmsley

Mary MacGregor

156.    Both the 2024 and 2025 Proxy Statements represented that "The Board maintains direct oversight over AI strategy risk. Our Environmental, Social, and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides oversight and guidance on Microsoft's responsible AI policies and programs."

157.    As members of the Board's Environmental, Social, and Public Policy Committee, Directors Pritzger, Hoffman, Stanton, Walmsley, and MacGregor were responsible for direct oversight of the Company's responsible AI strategy.  Through the conduct alleged herein, they acted in bad faith with respect to such duties, including by issuing statements which unequivocally represented that the Company fully complied with global copyright laws when they knew, or recklessly disregarded, the falsity of such statements.  They also repeatedly ignored red flags demonstrating that the Company was engaging in widespread copyright violations and failed to engage in further necessary inquiry in response to such red flags.  As a result, Defendants Pritzger, Hoffman, Stanton, Walmsley, and MacGregor face a substantial likelihood of liability.  Demand is thus futile as to such directors.

**F.      Demand is Futile for Additional Reasons**

158.    The Director Defendants' conduct was not the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As all the Director Defendants, who comprise eleven out of the current thirteen board members, face a substantial likelihood of liability, they are self-interested in the conduct challenged herein.  They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company.

48

SHAREHOLDER DERIVATIVE COMPLAINT

Accordingly, demand is excused as being futile.

159. The acts complained of herein constitute violations of fiduciary duties owed by Microsoft's officers and directors, and these acts are incapable of ratification.

160. The Director Defendants are covered by D&O insurance policies. Such policies contain provisions that eliminate coverage for any action brought by Microsoft against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Demand Directors were to sue themselves or certain of the officers of Microsoft, there would be no D&O insurance protection. By contrast, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under Microsoft's D&O insurance policy. Thus, there is no majority of disinterested directors among the Director Defendants and demand is excused as futile.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against All Individual Defendants)

161. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162. The Individual Defendants owed and owe Microsoft fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Microsoft the highest obligation of good faith, fair dealing, loyalty, and due care.

163. The Individual Defendants, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, care, and loyalty.

164. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Microsoft has been harmed, as alleged herein.

165. Plaintiff seeks declaratory and injunctive relief to remedy Defendants' breaches of fiduciary duty.

49

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

**SECOND CAUSE OF ACTION**
**Violation of Section 14(a) of the Securities Exchange Act**
**(Against All Director Defendants)**

166.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.  Plaintiff specifically disavows any allegation of fraud in this claim for violation of Section 14(a).

167.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

168.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

169.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

170.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the Company's Proxy Statements filed with the SEC, as alleged herein.

171.    The 2024 and 2025 Proxy Statements were used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board and approval of executive compensation, among other things.  The Proxy Statements also contained the Director Defendants' recommendations against shareholder proposals addressed to Microsoft's AI strategy and use.

172.    The 2024 and 2025 Proxy Statements were materially false and misleading for the

50

SHAREHOLDER DERIVATIVE COMPLAINT

reasons alleged herein, as they contained affirmative misstatements and material omissions. The material omissions in the Proxy Statements made the affirmative statements in the Proxies half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statements not misleading. *See* 17 C.F.R. § 240.12b-20.

173. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

174. The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

175. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## THIRD CAUSE OF ACTION
### Unjust Enrichment
### (Against the Executive Officer Defendants)

176. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177. By their wrongful acts and omissions, the Executive Officer Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

178. During the relevant time period, the Executive Officer Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Executive Officer Defendants' bad faith conduct. As alleged *supra*, Nadella alone was awarded unjust compensation in the aggregate amount of $224,115,510 million between 2023-25.

179. Defendant Hood was awarded the following compensation during the relevant time period:

SHAREHOLDER DERIVATIVE COMPLAINT

COTCHETT, PITRE & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

| Named Executive and Principal Position | Year | Salary ($) | Stock Awards[1] ($) | Non-equity Incentive Plan Compensation[2] ($) | All Other Compensation[3] ($) | Total ($) |
|---|---|---|---|---|---|---|
| | 2025 | 1,000,000 | 25,037,360 | 3,421,000 | 23,191 | 29,481,551 |
| Amy E. Hood | 2024 | 1,000,000 | 21,094,956 | 3,642,750 | 61,500 | 25,799,206 |
| | 2023 | 1,000,000 | 16,450,701 | 2,295,250 | 156,946 | 19,902,897 |

180. The exact compensation of Defendants Spataro and Jha is not publicly reported by Microsoft and thus discovery is necessary to allege their compensation with more specificity.

181. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Executive Officer Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation obtained by the Executive Officer Defendants due to their wrongful conduct and breach of their fiduciary duties.

### IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Microsoft and that Plaintiff is an adequate representative of the Company;

B.    Declaring that Defendants have breached their fiduciary duties to Microsoft;

C.    Determining and awarding to Microsoft the damages sustained as a result of the violations set forth above by all Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Directing Microsoft to take all necessary actions to reform and improve its corporate governance, internal controls, and policies by implementing a Board-level reporting and information system—and to monitor that system—to ensure that the Company addresses copyright infringement in any form, and any other civil and criminal laws relating to violation of intellectual property rights;

E.    Awarding against all Defendants and in favor of the Company extraordinary equitable and injunctive relief as permitted by law and/or equity as this Court deems just and

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272

appropriate;

F.      Awarding Plaintiff's costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

G.      Granting such other relief as this Court deems just and appropriate.

## X.      JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 10, 2026                                    Respectfully submitted,

                                                          COTCHETT PITRE & MCCARTHY, LLP

                                                          */s/ Karin B. Swope*

                                                          Karin B. Swope (SBN 24015)
                                                          1809 7th Avenue, Suite 1610
                                                          Seattle, Washington 98101
                                                          Telephone:      (206) 802-1272
                                                          Facsimile:      (206) 299-4184
                                                          Email:          kswope@cpmlegal.com


                                                          *Counsel for Plaintiff*

53

SHAREHOLDER DERIVATIVE COMPLAINT

## **<u>VERIFICATION</u>**

I, Vladimir Gusinsky, on behalf of the Vladimir Gusinsky Revocable Trust, verify that I am a shareholder of nominal defendant Microsoft Corporation (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August <u>7</u>, 2026

_Vladimir Gusinsky_
Vladimir Gusinsky (Aug 7, 2026 16:54:29 CDT)
_____
Vladimir Gusinsky, on behalf of
the Vladimir Gusinsky Revocable Trust

SHAREHOLDER DERIVATIVE COMPLAINT

**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272